# United States Court of Appeals
# for the First Circuit

---

CONSUMER DATA INDUSTRY ASSOCIATION
Plaintiff - Appellee

v.

AARON M. FREY, in his capacity as Attorney General of the State of Maine;
WILLIAM N. LUND, in his capacity as Superintendent of
the Maine Bureau of Consumer Credit Protection
Defendants - Appellants

---

On Appeal from the United States District Court for the District of Maine
Case No. 1:19-cv-00438-GZS

---

## BRIEF OF *AMICI CURIAE* NATIONAL CONSUMER LAW CENTER, MAINE EQUAL JUSTICE, AND MAINE COALITION TO END DOMESTIC VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLANTS SEEKING REVERSAL

---

Frank D'Alessandro
Maine Equal Justice
126 Sewall Street
Augusta, ME 04330
(207) 626-7058 ext. 202
frank@mejp.org

Andrea Bopp Stark
First Circuit Bar No. 1143585
Chi Chi Wu
Ariel Nelson
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
astark@nclc.org

*Counsel for Amici Curiae*

Dated: January 26, 2021

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* state they are nonprofit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in *amici curiae*.

/s/ *Andrea Bopp Stark*
Andrea Bopp Stark

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF IDENTITY AND INTERESTS OF *AMICI CURIAE* ...............1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ...................................................................................4

I. The Scope of Preemption under Section 1681t(b)(1)(E) Is Limited to Only Those State Laws Regulating the Specific Topics Addressed by Section 1681c .....................................................4

 A. The text and structure of the FCRA indicate that Section 1681t(b)(1)(E) does not preempt any and all state laws regulating the contents of a consumer report.............................5

 B. The legislative history indicates that Congress intended the scope of Section 1681t(b)(1)(E) to be limited to the topics specifically regulated by Section 1681c.........................9

 C. Section 1681t(b)(1)(E) only preempts the Maine laws at issue to the extent they regulate the specific topics addressed by Section 1681c .....................................................13

II. The Policies Underlying Maine's Economic Abuse and Medical Debt Provisions Are Consistent with the Goals of the FCRA ............14

 A. The Economic Abuse Provision addresses the serious problem of economic abuse and coerced debt.........................14

  1. *The reporting of debt resulting from economic abuse significantly impacts the ability of survivors to obtain credit, employment, and housing* ...................17

ii

2.     *Even when other legal remedies exist, the Economic Abuse Provision provides a streamlined process for survivors of economic abuse to address credit damage* ..............................................................18

3.     *The Economic Abuse Provision will ensure more accurate consumer reports for survivors of economic abuse*..............................................................22

B.    The Medical Debt Provision addresses the problem of medical debt in consumer reports ............................................23

1.     *Medical debt is pervasive and often inaccurate* .............23

2.     *Medical debt reporting harms consumers even though it is not predictive of credit worthiness* ..............24

3.     *The Medical Debt Provision brings relief to the problem of medical debt reporting by implementing already existing practices* ........................25

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE..................................................29

CERTIFICATE OF SERVICE ...........................................................30

# TABLE OF AUTHORITIES

CASES:

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) ........................................4, 6

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ........................................9

*Drew v. Experian*, 690 F.3d 1100 (9th Cir. 2012) ..................................20

*Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437 (2d Cir. 2015)....................8

*Grant's Dairy--Maine, LLC v. Comm'r of Maine Dep't of Agric., Food & Rural Res.*, 232 F.3d 8 (1st Cir. 2000) ........................................8

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ............................8

*Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176 (1st Cir. 1999)........9

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ..........................................4

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)....................................6

*Saunders v. Branch Bank & Trust Co.*, 526 F.3d 142 (4th Cir. 2008) ....................27

*Tobin v. Federal Express Corp.*, 775 F.3d 448 (1st Cir. 2014)................................4

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................4, 8

STATUTES:

15 U.S.C. § 1666 *et seq.*....................................................................22

15 U.S.C. § 1681 (1970) ....................................................................12

15 U.S.C. § 1681 ..............................................................................22

15 U.S.C. § 1681c ........................................................................*passim*

15 U.S.C. § 1681c(a)..........................................................................6

15 U.S.C. § 1681c(a)(7) ................................................3, 13

15 U.S.C. § 1681c(a)(8) ................................................3, 13

15 U.S.C. § 1681c(d)(1) .....................................................6

15 U.S.C. § 1681c(d)(2) .....................................................6

15 U.S.C. § 1681c(e) ..........................................................6

15 U.S.C. § 1681c(f) ...........................................................6

15 U.S.C. § 1681c(g) ..........................................................6

15 U.S.C. § 1681c(h) ..........................................................6

15 U.S.C. § 1681e(b) ..........................................................7

15 U.S.C. § 1681k ...............................................................7

15 U.S.C. § 1681b(1) .........................................................10

15 U.S.C. § 1681t(b)(1)(E) ............................................*passim*

15 U.S.C. § 1681t(b)(1)(F) ..............................................8

15 U.S.C. § 1692–1692P ...................................................22

15 U.S.C. § 1693 *et seq.* ..................................................22

Cal. Civ. Code §§ 1785.1 to 1787.3 (West) (California Consumer Credit
   Reporting Agencies Act, originally passed in 1975) .......................7

Me. Rev. Stat. tit. 10, § 1310-H(2-A) (2019) .............3, 13, 16, 20, 21, 26

Me. Rev. Stat. tit. 10, § 1310-H(4) (2019) ..........................3, 26

Me. Rev. Stat. tit. 10, § 1310-H(4)(B) (2019) .........................26

Me. Rev. Stat. tit. 10, § 1310-H(4)(C) (2019) .........................26

Me. Rev. Stat. tit. 14, § 6001(6)(H) (2019) .......................20, 21

Me. Rev. Stat. tit. 32, § 11013(2)(H) ...............................................21

Me. Rev. Stat. tit. 32, § 11014(2-A) ...............................................21

N.Y. Gen. Bus. Law §§ 380 to 380-t (McKinney) (New York Fair Credit
    Reporting Act, originally passed 1977) ............................. 7-8

**OTHER AUTHORITIES:**

141 Cong. Rec. S5450 (daily ed. Apr. 5, 1995) ....................... 10, 11-12

Adrienne E. Adams et al., *Development of the Scale of Economic Abuse*, 14
    Violence Against Women 563 (2008) ...............................14, 15

Tara Siegel Bernard, *Credit Scores Could Rise with FICO's New Model*,
    N.Y. Times (Aug. 7, 2014) ............................................24, 25

Mary P. Brewster, *Power and Control Dynamics in Prestalking and Stalking
    Situations*, 18 J. of Fam. Violence 207 (2003) .......................15

Erika Harrell, U.S. Dep't of Just., *Victims of Identity Theft, 2016* (2019) ..............19

Angela Littwin, *Coerced Debt: The Role of Consumer Credit in Domestic
    Violence*, 100 Calif. L. Rev. 951 (2012) ......................14, 16, 17

Judy L. Postmus et al., *Understanding Economic Abuse in the Lives of
    Survivors*, 27 J. of Interpersonal Violence 411 (2011) ..................14

Mark Rukavina, *Medical Debt and its Relevance When Assessing
    Creditworthiness*, 46 Suffolk U. L. R. 967 (2013) ......................23

Kevin Wack, *Credit Scoring Model Bucks the Industry Line on Paid Debts*,
    Am. Banker (Mar. 11, 2013) ....................................... 24-25

Chi Chi Wu, National Consumer Law Center, *Automated Injustice Redux*
    (2019) ....................................................................19

Consumer Fin. Prot. Bureau, *Consumer Credit Reports: A Study of Medical
    and Non-Medical Collections* (2014) .............................23, 24

Consumer Fin. Prot. Bureau, *Data Point: Medical Debt and Credit Scores*
(2014) .................................................................................................... 23-24

Consumer Reporting Reform Act of 1994, H.R. 1015, 103rd Cong. § 120
(1994) ............................................................................................................ 12

Consumer Reporting Reform Act of 1994, S. 783, 103rd Cong. § 116 (1994) ...... 12

Consumer Reporting Reform Act of 1995, S. 709, 104th Cong. (1995) ........... 10, 11

Continuing Budget Resolution, H.R. 3610, 104th Cong. (1995) ........................... 10

*In the Matter of Equifax Info. Servs. L.L.C., Experian Info. Sols., Inc., and
TransUnion L.L.C.* (May 20, 2015) ........................................................... 25
Nat'l Consumer Law Ctr., *Fair Credit Reporting*, § 4.2.4 (9th ed. 2017) ........... 1, 27

Nat'l Consumer Law Ctr., *Fair Credit Reporting*, Appendix H (9th ed. 2017) ........ 8

# STATEMENT OF IDENTITY AND INTERESTS OF *AMICI CURIAE*[1]

The National Consumer Law Center (NCLC) is a nonprofit organization that works for consumer justice and economic security for low income and other disadvantaged people, including older adults, in the United States through its expertise in policy analysis and advocacy, publications, litigation, expert witness services, and training. NCLC draws on over forty years of expertise regarding the Fair Credit Reporting Act (FCRA) and its protections for consumers. NCLC provides information, legal research, and policy analysis to Congress, state legislatures, administrative agencies, and courts. NCLC publishes *Fair Credit Reporting* (9th ed. 2017), the definitive treatise on the FCRA. The Supreme Court of the United States has cited NCLC's treatises with approval.

Maine Equal Justice is a nonprofit civil legal services organization dedicated to working with and for people with low income seeking solutions to poverty through policy, education, and legal representation. Maine Equal Justice represents consumer's interests at the legislature, including by improving their rights in connection with the Maine Fair Debt Collections Practices Act and the Maine Fair Credit Reporting Act. Maine Equal Justice also represents the interests of victims

---

[1] Pursuant to Rule 29(a)(2), counsel for *amici curiae* certifies that all parties have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), counsel for *amici curiae* states that no counsel for a party authored this brief in whole or in part, and no person other than *amici curiae*, their members, or their counsel made a monetary contribution to its preparation for submission.

of domestic violence and strongly advocated for the passage of the provisions of Maine law at issue in this case. Maine Equal Justice also represents consumers in debt collection actions. This case touches on a core feature of many consumer cases in which Maine Equal Justice is involved: the right not to be held responsible for the non-payment of debts one was coerced into entering.

The Maine Coalition to End Domestic Violence (MCEDV) represents Maine's eight regional domestic violence resource centers, who collectively work with approximately 14,000 survivors of domestic abuse and violence in Maine annually, providing free and confidential services designed to respond directly to the safety and security needs of survivors and to address the impacts of abuse on survivors and their families. Thus, MCEDV is uniquely positioned to recognize and articulate the barriers to safety that survivors in Maine experience and to propose solutions.

## SUMMARY OF ARGUMENT

The Fair Credit Reporting Act's (FCRA) text and structure, as well as its legislative history, clearly indicate that Congress did not intend to enact a sweeping prohibition against all state regulation of the contents of a consumer report. To the contrary, 15 U.S.C. § 1681t(b)(1)(E) provides for only limited preemption of state laws regulating the specific topics addressed in each subsection of Section 1681c. The presumption against preemption further supports this interpretation.

Because Section 1681c of the FCRA does not include any provisions addressing economic abuse, title 10, section 1310-H(2-A) of the Maine Revised Statutes (the Economic Abuse Provision) is not preempted. While Section 1681c does have provisions addressing medical debt, it specifically addresses medical debts held by veterans only. Thus, Section 1681t(b)(1)(E) only preempts Maine from regulating *veteran's* medical debt. However, if the Court determines instead that the preemption extends to regulation of all medical debt, including title 10, section 1310-H(4) of the Maine Revised Statutes (the Medical Debt Provision), the Court should hold so solely on the basis that Section 1681c(a)(7) and (8) of the FCRA specifically address the issue of medical debt.

The policies underlying Maine's Economic Abuse and Medical Debt Provisions are consistent with the goals of the FCRA, including accurate consumer reporting, and supplement already-existing provisions of federal law or codify existing practices agreed to by the credit reporting industry. Maine passed the Economic Abuse Provision to alleviate the damage to credit caused by economic abuse. It does not contradict the FCRA, but rather supplements and streamlines procedures already available to survivors of economic abuse. Because Maine law now also prohibits collection of debts caused by economic abuse, prohibiting the reporting of these debts reflects the credit status of survivors more accurately.

Maine passed the Medical Debt Provision in order to address the reporting of medical debt in a way that reflects changes already agreed to by the nationwide consumer reporting agencies (CRAs) or made by some sectors of the consumer reporting and credit scoring industry. The net effect is the removal of negative credit information when medical debt has been paid or settled in full and the appearance of positive credit data when medical debt is in repayment. These changes will in turn lead to higher credit scores that accurately reflect the financial status of a consumer.

## ARGUMENT

### I. The Scope of Preemption under Section 1681t(b)(1)(E) Is Limited to Only Those State Laws Regulating the Specific Topics Addressed by Section 1681c

The Supreme Court and this Court have explained that "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (same); *Tobin v. Federal Express Corp.*, 775 F.3d 448, 452–53 (1st Cir. 2014) ("Congressional intent is the touchstone of any effort to map the boundaries of an express preemption provision."). To illuminate Congress's purpose, "we start with the text and context of the provision itself." *Tobin*, 775 F.3d at 542. Statutory structure, purpose, and legislative history also inform the analysis. *Id.* at 543. The FCRA's

text and structure indicate that Congress intended Section 1681t(b)(1)(E) to preempt only laws regulating the specific topics addressed in each subsection of Section 1681c. The legislative history of the Act, including unequivocal statements by the drafters of that section, similarly evidences that Congress had a limited scope of preemption as its purpose.

A.   **The text and structure of the FCRA indicate that Section 1681t(b)(1)(E) does not preempt any and all state laws regulating the contents of a consumer report**

At the heart of this case are significantly differing interpretations of Section 1681t(b)(1)(E). That paragraph provides:

> (b) No requirement or prohibition may be imposed under the laws of any State— (1) with respect to *any subject matter regulated under*— . . . (E) section 1681c of this title, *relating to information contained in consumer reports*, except that this subparagraph shall not apply to any State law in effect on September 30, 1996 . . . .

15 U.S.C. § 1681t(b)(1)(E) (emphasis added). Appellee contends that this paragraph preempts all state laws that regulate what information can be included in credit and other consumer reports, placing emphasis on the phrase "information contained in consumer reports." App. to Defs.-Appellants Br. 10. The State of Maine, on the other hand, argues that this paragraph preempts only the specific issues addressed in Section 1681c, placing the emphasis on "subject matter regulated under . . . section 1681c." Defs.-Appellants Br. 20–21. Under the State of Maine's interpretation, preemption would be limited to the following issues:

- The length of time older negative information may be reported ("obsolescence time periods"); reporting of the identity of medical information furnishers; reporting of veteran's medical debt. 15 U.S.C. § 1681c(a).

- If there is a bankruptcy included in a report, the chapter under which the case was filed. *Id.* § 1681c(d)(1).

- For reporting of a credit score, the report must state that the number of enquiries is a key factor that affected the score. *Id.* § 1681c(d)(2).

- The report must include the fact that an account was voluntarily closed by a consumer. *Id.* § 1681c(e).

- If any information is disputed by the consumer. *Id.* § 1681c(f).

- Truncation of credit and debit card numbers. *Id.* § 1681c(g).

- Notice of an address discrepancy. *Id.* § 1681c(h).

That the parties disagree over the meaning of Section 1681t(b)(1)(E) is not surprising. Indeed, the Supreme Court has noted the presence of "less-than-pellucid statutory text" in the FCRA. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007). And where statutory text is less-than-pellucid, the Supreme Court has made clear that courts should choose the interpretation that disfavors preemption. *See Altria Grp., Inc.*, 555 U.S. at 77 ("[W]hen the text of a pre-emption clause is

susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" (citation omitted)).

Even more importantly, the structure of the FCRA as a whole, and of Section 1681t(b)(1)(E) in particular, confirm the State of Maine's interpretation: that Congress did not intend to universally preempt any state laws regulating the contents of consumer reports.

First, Congress did not extend the type of express subject matter preemption in Section 1681t(b)(1)(E) to other sections of the FCRA that deal with the contents of consumer reports. For example, Section 1681k, which regulates the inclusion of negative public records in consumer reports used for employment purposes, is not subject to this onerous form of preemption. *See* 15 U.S.C. § 1681k. Neither is Section 1681e(b), which requires the employment of reasonable procedures for maximum possible accuracy in the preparation of a consumer report. *See id.* § 1681e(b).

Second, Section 1681t(b)(1)(E) itself saves from preemption "any State law in effect on September 30, 1996." *Id.* § 1681t(b)(1)(E). If Congress truly wanted to set uniform federal standards regarding the contents of consumer reports, it would not have excluded state laws in effect at the time, of which there were many. *See e.g.*, Cal. Civ. Code §§ 1785.1 to 1787.3 (West) (California Consumer Credit Reporting Agencies Act, originally passed in 1975)); N.Y. Gen. Bus. Law §§ 380

to 380-t (McKinney) (New York Fair Credit Reporting Act, originally passed 1977). *See generally* Nat'l Consumer Law Ctr., *Fair Credit Reporting*, Appendix H (9th ed. 2018), https://library.nclc.org/FCR/ (list and summary of all such state laws).

Furthermore, both the Supreme Court and this Court have established a clear presumption against preemption. *Wyeth*, 555 U.S. at 565 ("[I]n all pre-emption cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (internal quotation marks and citations omitted)); *Grant's Dairy--Maine, LLC v. Comm'r of Maine Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 14–15 (1st Cir. 2000) (same); *see also Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 445 (2d Cir. 2015) (in FCRA preemption case interpreting Section 1681t(b)(1)(F), cautioning that that paragraph must be interpreted "fairly but narrowly, mindful in the appropriate case that 'each phrase within [the provision] limits the universe of [state action] pre-empted by the statute'" (alterations in original) (emphasis added) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 551 (2001))).

The presumption against preemption further compels an interpretation of Section 1681t(b)(E) that only permits preemption of state laws regulating the specific topics addressed in each subsection of Section 1681c. Thus, contrary to the

district court's interpretation, Congress did not make an affirmative choice to set uniform federal standards for every aspect of the information contained in consumer reports. *See* Defs.-Appellants Addendum 13. The "subject matter regulated under" Section 1681c is not the content of consumer reports. Rather, it is the inclusion or exclusion of certain pieces of information. Beyond these specific requirements, Congress did not intend to deprive the states of their historic police powers to protect consumers with respect to the contents of consumer reports.

### B. The legislative history indicates that Congress intended the scope of Section 1681t(b)(1)(E) to be limited to the topics specifically regulated by Section 1681c

In cases where the statutory text is less-than-pellucid, legislative history can be among the tools used to discern its meaning. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (Justice Scalia noting that "[r]eal (pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law"). This Court has considered legislative history even when the statutory text was clear "in an abundance of caution." *Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 184 (1st Cir. 1999) ("Although textual analysis resolves the statutory construction issue, we sometimes have looked to legislative history to confirm textual intuitions.").

With respect to the preemptive provisions of the 1996 FCRA amendments, the legislative history provides clear evidence that Congress did not intend Section 1681t(b)(1) in general to have a broad, sweeping scope of preemption, and in particular did not intend to preempt all state regulation of what can and cannot be included in a consumer report.

In April 1995, Senator Christopher ("Kit") Bond (R-MO) introduced the Consumer Reporting Reform Act of 1995, S. 709, 104th Cong. (1995), in the Committee on Banking, Housing, and Urban Affairs. S. 709 is the bill that would be later included in the 1996 Continuing Budget Resolution, H.R. 3610, 104th Cong. (1995), and would become the 1996 Reform Act Amendments to the FCRA. In introducing the bill, Senator Bond explained:

> This bill also contains *limited* Federal preemption to ensure that there are uniform Federal standards to govern a number of *procedural issues* which are part of credit reporting and which will reduce the burdens on the credit industry from having to comply with a variety of different State requirements. For example, the bill preempts requirements regarding prescreening, information shared among affiliates, reinvestigation timetables, *obsolescence time periods* and certain disclosure forms.

141 Cong. Rec. S5450 (daily ed. Apr. 5, 1995) (statement of Sen. Bond) (emphasis added).

The preemption provision that Senator Bond included in S. 709 contains language nearly identical to what became the preemption provision at current Section 1681t(b)(1)(E), as it states:

(b) No requirement or prohibition may be imposed under the laws of any State— (1) with respect to any subject matter regulated under—(F) section 605 [Section 1681c], relating to information contained in consumer reports, except that this subparagraph does not apply to any State law in effect on the date of enactment of the Consumer Reporting Reform Act of 1995.

S. 709.

Senator Bond's statement makes clear that, as the bill's author, he intended this preemption provision to be limited to the specific issues addressed in Section 1681c, particularly obsolescence time periods, and did not intend to preempt all state regulation of the contents of consumer reports. Indeed, Senator Bond characterized the preemption as "limited" in nature and designed to govern "procedural issues." These descriptions contradict any notion that he intended this preemption provision to foreclose the possibility of any state regulation of the contents of a consumer report.

Statements by the other co-sponsor of S. 709, Senator Richard Bryan (D-NV), similarly indicate that the preemption provisions were intended to be limited in scope. Senator Bryan noted:

This legislation tries to craft a delicate balance on the issue of State preemption. Senator BOND and I are both former Governors so we take States' rights very seriously. We have tried to only preempt those areas of this law which affect the operational efficiencies of businesses but do not harm consumers. Setting a national uniform standard for *disclosure forms* or *time-tables*, does not set the consumer movement back, yet should help the business community operate more efficiently.

I would like to put everyone on notice that I feel very strongly that we should not preempt States' rights in the area of liability—particularly if we set a low-liability standard as we do in this bill. Certain members of the

business community have and will continue to push to preempt this area of State law, but I will fight such efforts and will have to reconsider the merits of this bill, should I lose on this issue.

141 Cong. Rec. S5450 (daily ed. Apr. 5, 1995) (statement of Sen. Bryan) (emphasis added). Senator Bryan's remarks are hardly the words of a man who thought he was handcuffing the states from being able to adopt greater protections for consumers with respect to any of the information that is permitted to be included in a consumer report.

Furthermore, prior versions of the bills that led to the 1996 Reform Act Amendments to the FCRA specifically referred to the preemption for Section 1681c as preempting state law limitations for obsolete information. *See, e.g.*, Consumer Reporting Reform Act of 1994, H.R. 1015, 103rd Cong. § 120 (1994); Consumer Reporting Reform Act of 1994, S. 783, 103rd Cong. § 116 (1994) (same). This is likely because Section 1681c as enacted in 1970 only prohibited the inclusion of obsolete information. 15 U.S.C. § 1681c (1970). The bills that led to the 1996 Reform Act added several subsections to Section 1681c that did not address the issue of obsolescence but rather topics such as requiring a notation when an account is closed by the consumer, bankruptcy chapter information, and notations of consumer disputes. Thus, the preemption provision was likely expanded to include the matters regulated by those specific subsections within the scope of preemption. It was not, as Appellee contends, intended to prohibit the

states from regulating all aspects of what can or cannot be included in a consumer report.

**C.** **Section 1681t(b)(1)(E) only preempts the Maine laws at issue to the extent they regulate the specific topics addressed by Section 1681c**

Section 1681t(b)(1)(E) of the FCRA does not preempt states from all attempts to regulate the contents of a consumer report. Instead, it only preempts states from regulating the specific topics that Section 1681c addresses. Section 1681c does not contain any provisions addressing economic abuse. Section 1681t(b)(1)(E) therefore clearly does not preempt Maine's Economic Abuse Provision, Me. Rev. Stat. tit. 10, § 1310-H(2-A) (2019), which governs the reporting of economic abuse.

Section 1681c does include two provisions, paragraphs (a)(7) and (8), which address the treatment of medical debt. However, these paragraphs only address medical debt held by veterans. The Court should hold, therefore, that Section 1681t(b)(1)(E) only preempts Maine from regulating *veteran's* medical debt. However, if the Court reaches the opposite conclusion and holds that preemption extends to regulation of all medical debt, *amici* urge the Court to hold so on the basis that Section 1681c(a)(7) and (8) of the FCRA specifically address the issue of medical debt, and not that states are preempted from any and all regulation of the contents of a consumer report.

II.   **The Policies Underlying Maine's Economic Abuse and Medical Debt Provisions Are Consistent with the Goals of the FCRA**

A.   **The Economic Abuse Provision addresses the serious problem of economic abuse and coerced debt**

Abusive partners utilize different methods to control their victims, including physical, emotional, psychological, and economic abuse. Economic abuse involves behaviors that control a person's ability to acquire, use, or maintain economic resources, therefore undermining that person's financial security. Adrienne E. Adams et al., *Development of the Scale of Economic Abuse*, 14 Violence Against Women 563, 564 (2008). Researchers estimate that between 94 and 99% of women seeking services for intimate partner violence have experienced economic abuse. *See id.* at 580; Judy L. Postmus et al., *Understanding Economic Abuse in the Lives of Survivors*, 27 J. of Interpersonal Violence 411, 424 (2011).

While economic abuse spans a wide array of abusive behavior, damage to credit is one predominant tactic abusers use to exert control over survivors. This phenomenon has become increasingly prevalent as consumer lending has permeated American life and "mak[es] the consumer credit system an unknowing party to domestic violence." Angela Littwin, *Coerced Debt: The Role of Consumer Credit in Domestic Violence*, 100 Calif. L. Rev. 951, 953 (2012).

The term "coerced debt" can be used to describe "all nonconsensual credit-related transactions that occur in a violent relationship." *Id.* at 954. Coerced debt

includes abusive partners destroying credit by fraudulently opening accounts in a survivor's name, lying about paying bills in a survivor's name, overcharging credit accounts, or coercing survivors to sign for loans, credit lines, or other expenses. Abusive partners thereby utilize the consumer credit system to leave many survivors with hundreds or thousands of dollars of coerced debt.

Evidence of coerced debt has emerged in several studies. In a qualitative study of 187 women stalked by former intimate partners, 22.5% had partners who exerted financial control over them, including by opening credit cards in their names. Mary P. Brewster, *Power and Control Dynamics in Prestalking and Stalking Situations*, 18 J. of Fam. Violence 207, 209 (2003). Research to develop the Scale of Economic Abuse (SEA) found that 39% of the 103 women who were interviewed and were seeking services for domestic violence had debt built under their name by their partners putting a car, apartment/house, or credit card in their name; 53% reported that their partner had used their checkbook, ATM card, or credit card without their permission and/or knowledge; and 68% reported that their partner had forced them to give him money or let him use their checkbook, ATM card, or credit card. Adams et al., *supra*, at 576.

The connection between abuse and debt also is substantiated by findings from the 2007 Consumer Bankruptcy Project (CBP), which shows that 17.8% of the 258 married and cohabitating female participants experienced intimate partner

abuse in the year they filed for bankruptcy. Littwin, *supra*, at 957–58. This rate is much higher than the rates of abuse found in studies of the general population of women, which range from 1.5% to 9.8% in samples of women most comparable with that of the CBP, suggesting a strong connection between abuse and financial distress. *Id.* at 958 & n.32.

As part of its report to the Maine Commission on Domestic and Sexual Abuse, the Maine Coalition to End Domestic Violence (MCEDV) asked survivors of domestic violence a series of questions related to economic abuse, including coerced debt. MCEDV found that 40% of respondents indicated their partners falsely used their identity without their knowledge; 36% reported their identities were used to access credit or set up utilities; and 72% of respondents said their partners often claimed they were paying bills when they were not. App. 90. In fact, 57% of those surveyed reported that their abusive partners incurred debt using their name. *Id.*

In recognition of the harm that economic abuse causes, Maine enacted the Economic Abuse Provision, Me. Rev. Stat. tit. 10, § 1310-H(2-A) (2019). The Economic Abuse Provision delineates a three-pronged approach to bring relief to survivors of economic abuse and coerced debt. One prong targets the reporting of debt or portions of debt that result from economic abuse to consumer reporting agencies. This type of relief is essential to ensuring that coerced debt does not

prevent survivors from accessing necessities such as credit, employment, and housing.

      **1.**      ***The reporting of debt resulting from economic abuse significantly impacts the ability of survivors to obtain credit, employment, and housing***

Creditors, potential employers, and landlords routinely use consumer reports to evaluate an applicant. The appearance of coerced debt and other detrimental information resulting from economic abuse negatively impacts a survivor's ability to obtain credit, a job, and housing. Survivors often cannot obtain credit from traditional lenders and therefore may be forced to turn to predatory sources like payday lenders. These high-cost loans aggravate an already desperate financial situation, trapping survivors in insurmountable debt.

Survivors of domestic violence are apt to stay in abusive relationships if ending the relationship would result in poverty or homelessness. If children are involved, survivors are even more prone to stay in an abusive relationship in order to shield their children from economic instability. Damaging their partner's credit therefore allows perpetrators to gain further financial control over the survivor's current and future economic choices. *See* Littwin, *supra*, at 955.

The record of Maine residents testifying in support of the Economic Abuse Provision is replete with examples of economic abuse destroying a survivor's credit and crippling their ability to access other necessities such as housing. *See*

App. 33–128. For example, Ms. Rachel Glaser stated that prior to the economic abuse she experienced, she had a credit score in the 700s. *Id.* at 47. She was employed, had a 401k policy, a life insurance policy, and almost $100,000 in equity. *Id.* In addition to committing severe acts of physical abuse, Ms. Glaser's abuser made unauthorized purchases on her bank card and coerced her to take out more debt in her name to pay for expenses he had accrued. *Id.* Consequently, the home she owned was foreclosed on and her credit score "plummeted to the 400's." *Id.*

Attorney Nicole Golden-Bouchard of Pine Tree Legal Assistance wrote that she routinely sees abusers put household bills in the name of survivors, default on the accounts, and "tell the victim they can't leave because no one will rent to them or give them an account for light or heat because their credit is destroyed." *Id.* at 53–54. The stories of Maine residents illustrate the importance of correcting a credit report by deleting data caused by economic abuse and coerced debt. The Economic Abuse Provision provides a mechanism to do just that.

> **2.** **_Even when other legal remedies exist, the Economic Abuse Provision provides a streamlined process for survivors of economic abuse to address credit damage_**

Although the federal FCRA provides remedies to correct negative entries resulting from unauthorized debt, pursuing these remedies often requires the help of an experienced advocate and can take an inordinate amount of time. There are

no studies examining the difficulty survivors of economic abuse face in removing negative data resulting from economic abuse from their credit reports. However, information concerning identity theft victims demonstrates that attempting to resolve financial and credit problems associated with identity theft can take months, especially when the thief has opened a new account in the victim's name. Erika Harrell, U.S. Dep't of Just., *Victims of Identity Theft, 2016*, at 11, 25 (2019), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6467; Chi Chi Wu, Nat'l Consumer Law Ctr., *Automated Injustice Redux* 11, 18–20 (2019), https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

After victims have discovered the identity theft, they must wait weeks and months to receive information about their accounts from the consumer reporting agencies (CRAs), a protracted process that hinders remedial action and perpetuates the harm as the victims are forced to deal with disbelieving debt collectors and creditors. Resolving problems associated with identity theft requires that consumers spend time contacting and re-contacting creditors, public officials, and CRAs, closing and opening new accounts, and even fending off debt collectors and civil suits.

Identity theft victims often experience great difficulty in cleaning up their credit reports. Frequently, the victim must live with the consequences of identity theft for months or years. *See* Wu, *supra* (describing inability of consumers,

including identity theft victims, to correct inaccurate information on credit reports). When CRAs fail to keep corrected information in the file and incorrect information from repeatedly reappearing in the file, the consumer's frustration and injury goes on for years. *See, e.g.*, *Drew v. Experian*, 690 F.3d 1100, 1104–05 (9th Cir. 2012).

The Economic Abuse Provision streamlines and supplements the process by which survivors of economic abuse can obtain relief from credit damage. Specifically, a survivor can dispute coerced debt and other debt resulting from economic abuse directly to the consumer reporting agency (CRA) and have these debts removed from their reports. Me. Rev. Stat. tit. 10, § 1310-H(2-A) (2019). The statute provides guidance on what documents a survivor can include in their dispute to the CRAs to prove economic abuse. *See id.* (citing Me. Rev. Stat. tit. 14, § 6001(6)(H) (2019)).[2] CRAs do not have to be experts in understanding economic

---

[2] Acceptable documentation includes, but is not limited to:

(1) A statement signed by a Maine-based sexual assault counselor as defined in Title 16, section 53-A, subsection 1, paragraph B, an advocate as defined in Title 16, section 53-B, subsection 1, paragraph A or a victim witness advocate as defined in Title 16, section 53-C, subsection 1, paragraph C;

(2) A statement signed by a health care provider, mental health care provider or law enforcement officer, including the license number of the health care provider, mental health care provider or law enforcement officer if licensed;

(3) A copy of a protection from abuse complaint or a temporary order or final order of protection;

(4) A copy of a protection from harassment complaint or a temporary order or final order of protection from harassment;

(5) A copy of a police report prepared in response to an investigation of an incident of domestic violence, sexual assault or stalking; and

abuse. If survivors include with their dispute to the CRAs any of the listed documents, then the CRAs must remove the debt or portion of the debt from the survivor's credit report. Me. Rev. Stat. tit. 10, § 1310-H(2-A).

Contrary to Appellee's argument, removing the debt or portions of the debt resulting from economic abuse does not require its member CRAs to adjudicate the legal effect of a contract or determine contract liability. *See* App. 12. The statute simply requires CRAs to remove the appearance of the debt on a survivor's consumer report. CRAs are not required to determine whether the survivor *owes* the debt.

Furthermore, when the Economic Abuse Provision was added to the Maine Fair Credit Reporting Act, Maine's debt collection statute also was amended to prevent debt collectors from collecting debts caused by economic abuse. *See* Me. Rev. Stat. tit. 32, § 11014 (2-A). If a survivor provides a debt collector the same type of documentation it provided to the CRAs under title 14, section 6001(6)(H), then the debt collector must cease collection of the debt or any disputed portion of the debt—including reporting the debt to any CRA. Me. Rev. Stat. tit. 32, §§ 11013(2)(H), 11014(2-A). Therefore, under these provisions, a debt collector

---

(6) A copy of a criminal complaint, indictment or conviction for a domestic violence, sexual assault or stalking charge.
Me. Rev. Stat. tit. 14, § 6001(6)(H) (2019).

cannot report a debt caused by economic abuse, so there is nothing for a CRA to remove by complying with the Economic Abuse Provision.

### 3. The Economic Abuse Provision will ensure more accurate consumer reports for survivors of economic abuse

Appellee alleged in its complaint that removing the debt or portions of the debt resulting from economic abuse requires its member CRAs to reject accurate credit information. App. 12. This, they assert, will impede the CRAs' ability to report accurate and predictive data relied on by their customers credit underwriting or other legitimate purposes. *Id.* However, the opposite is true. When debts are not collectable as determined by Maine law and other federal statutes,[3] a survivor has the right to withhold payment. When debts are not collectable, there is no claim to a survivor's money or assets. As a result, these uncollectable debts should not factor into a creditor's assessment of credit worthiness. Therefore, by complying with the Economic Abuse Provision and removing the data caused by economic abuse, CRAs will ensure that their reports will more accurately show the credit picture of a survivor.

---

[3] Some of the remedies under federal law include provisions for unauthorized use of credit cards under the Fair Credit Billing Act, 15 U.S.C. § 1666 *et seq.*, unauthorized electronic transfers of bank funds under the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.,* protections from unlawful debt collection under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692p, and rights to dispute incorrect credit information under the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**B. The Medical Debt Provision addresses the problem of medical debt in consumer reports**

**1. *Medical debt is pervasive and often inaccurate***

Medical debt is very different from other types of consumer debt. Medical bills result from services that are frequently involuntary, unplanned, and unpredictable, and for which price quotes are rarely provided. However, medical debt still factors tremendously into credit scores and credit decisions. The Consumer Financial Protection Bureau (CFPB) found that medical debt collection entries account for over half (52.1%) of all entries by debt collectors on credit reports. Consumer Fin. Prot. Bureau, *Consumer Credit Reports: A Study of Medical and Non-Medical Collections* 5 (2014), https://www.consumerfinance. gov/data-research/research-reports/consumer-credit-reports-a-study-of-medical-and-non-medical-collections/. Additionally, nearly one in five credit reports contain a medical debt item. *Id.*

The accuracy of medical debt accounts on consumer reports is questionable. Medical debt accounts are often riddled with problems such as billing errors and disputes with insurers over liability for accounts. Mark Rukavina, *Medical Debt and its Relevance When Assessing Creditworthiness*, 46 Suffolk U. L. R. 967, 967 (2013). Over 99% of medical debts are reported by debt collectors, not healthcare providers. Consumer Fin. Prot. Bureau, *Data Point: Medical Debt and Credit*

*Scores* 4 (2014), https://www.consumerfinance.gov/data-research/research-reports/data-point-medical-debt-and-credit-scores/.

<blockquote>
**2.  Medical debt reporting harms consumers even though it is not predictive of credit worthiness**
</blockquote>

The CFPB found that the presence of medical debt on a credit report unfairly penalizes a consumer's credit score, resulting in a credit score that is typically lower by ten points than it should be. Consumer Fin. Prot. Bureau, *Data Point*, *supra*, at 11. Consumers with a paid-off medical collection item have scores that are up to twenty-two points lower than they should be. *Id*. at 19. This can set families on a path to financial hardship that can last for years.

The CFPB further noted that "[c]redit scoring models which differentiate medical collections from other collections are likely to more accurately reflect the actual creditworthiness of consumers." Consumer Fin. Prot. Bureau, *Consumer Credit Reports*, *supra*, at 51–52. In response, FICO modified its latest scoring model, FICO 9, so it no longer considers paid collection items (both medical and non-medical). *See* Tara Siegel Bernard, *Credit Scores Could Rise with FICO's New Model*, N.Y. Times (Aug. 7, 2014), https://www.nytimes.com/2014/08/08/your-money/credit-scores-could-rise-with-ficos-new-model.html. Consumers whose only negative item is unpaid medical debt can expect their score to increase up to twenty-five points. *Id.* VantageScore made a similar change to its scoring system in March 2013. Kevin Wack, *Credit Scoring Model Bucks the Industry Line on Paid*

*Debts*, Am. Banker (Mar. 11, 2013), https://www.americanbanker.com/news/credit-scoring-model-bucks-the-industry-line-on-paid-debts.

However, not all creditors use these scoring models. Mortgage industry giants Fannie Mae and Freddie Mac currently do not use these models but rather an older FICO model, which leaves consumers with lower credit scores. Bernard, *supra*.

### 3. *The Medical Debt Provision brings relief to the problem of medical debt reporting by implementing already existing practices*

In response to the many problems in credit reporting, including the problems with medical debt raised here, a multistate group of Attorneys General investigated the three nationwide CRAs—Experian, Equifax, and TransUnion. The investigation resulted in a settlement agreement between a group of 31 Attorneys General and the three nationwide CRAs. Among other protections, the settlement agreement prohibits the three nationwide CRAs from reporting medical debt that is not yet 180 days delinquent and requires removal or suppression of medical debt paid by insurance companies. Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance § IV (E)(3)(a), *In the Matter of Equifax Info. Servs. L.L.C., Experian Info. Sols., Inc., and TransUnion L.L.C.* (May 20, 2015), https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

The Medical Debt Provision, Me. Rev. Stat. tit. 10, § 1310-H(4) (2019), merely codifies this practice under Maine state law—*a practice that the nationwide CRAs previously agreed to and have already implemented*. The Maine law in no way impedes the CRAs' ability to report medical debts less than 180 days delinquent because the CRAs have already agreed to refrain from reporting this very data.

In response to the data provided by the CFPB, and to remedy the disparity between credit scoring models, the Medical Debt Provision prohibits the reporting of any medical debt that has been paid or settled in full. *Id.* § 1310-H(4)(B). CRAs must either remove or suppress this data from a consumer's credit report once provided with documentation from either the consumer, the creditor, or the debt collector. *Id.* The multistate settlement already provides for the removal of medical debts paid by an insurance company. The Medical Debt Provision merely extends this provision in a more logical and holistic manner; it requires removal of any medical debt that has been paid or settled in full, regardless of whether paid by an insurance company or the consumer. *Id.*

The Medical Debt Provision also requires that any regular, scheduled, periodic payments being made on medical debt be reported in the same manner as debt related to a consumer credit transaction, such as a credit card, mortgage or student loan account. *Id.* § 1310-H(4)(C). This provision does not impose any

requirements that the federal FCRA does not already require. Under the FCRA, numerous courts have held that information can be inaccurate if it is technically correct, but misleading or if it omits material information. *See, e.g.*, *Saunders v. Branch Bank & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008); *see generally* Nat'l Consumer Law Ctr., *Fair Credit Reporting*, § 4.2.4 (9th ed. 2017). Thus, it is not sufficient for a creditor to report only the existence of a debt; if the consumer is making regular repayments towards the debt, those payments should be reported. While currently debt collection items on a credit report do not include reporting of regular periodic payments, this absence is a matter of industry convention and is not mandated by the FCRA. Indeed, the absence of payment information should constitute a violation of the FCRA by omitting material information about a debt. The Medical Debt Provision therefore addresses and prevents any of these possible discrepancies.

## CONCLUSION

The FCRA's text, structure, and legislative history all indicate that Congress intended Section 1681t(b)(1)(E) to preempt only laws regulating the specific topics addressed in each subsection of Section 1681c. The presumption against preemption further compels this interpretation. Further, Maine's Economic Abuse and Medical Debt Provisions are consistent with the FCRA's goals, including accurate consumer reporting, and merely supplement already-existing provisions of

federal law or codify existing practices agreed to by the credit reporting industry.

*Amici* respectfully urge the Court to reverse the decision of the district court.

Respectfully submitted,

*/s/ Andrea Bopp Stark*
Andrea Bopp Stark
First Circuit Bar No. 1143585
Chi Chi Wu
Ariel Nelson
National Consumer Law Center
7 Winthrop Square
Boston, MA 02110
(617) 542-8010
astark@nclc.org

Frank D'Alessandro
Maine Equal Justice
126 Sewall Street
Augusta, Me. 04330
(207) 626-7058 ext. 202
frank@mejp.org

Counsel for *Amici Curiae*

Dated: January 26, 2021

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of
    Appellate Procedure 29(a)(5) because it contains 6,317 words, excluding the
    parts of the brief exempted by the Rules.

2.  This brief complies with the typeface requirements of Federal Rule of
    Appellate Procedure 32(a)(5) and the type-style requirements of Federal
    Rule of Appellate Procedure 32(a)(6) because it has been prepared in a
    proportionally spaced typeface using Microsoft Word 2019 in 14-point
    Times New Roman.

*/s/ Andrea Bopp Stark*
Andrea Bopp Stark
First Circuit Bar No. 1143585

Dated: January 26, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2021, I electronically filed the foregoing *Amici Curiae* Brief for the National Consumer Law Center, Maine Equal Justice, and Maine Coalition to End Domestic Violence with the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that the following parties or their counsel of record are registered ECF Filers and that they will be served by the CM/ECF system:

John J. Aromando
jaromando@pierceatwood.com

Ryan P. Dumais
rdumais@eatonpeabody.com

Rebecca Everett Kuehn
rkuehn@hudco.com

Christopher C. Taub
Christopher.C.Taub@maine.gov

*/s/ Andrea Bopp Stark*
Andrea Bopp Stark
First Circuit Bar No. 1143585

Dated: January 26, 2021